**UNITED STATES DISTRICT COURT**

**DISTRICT OF MINNESOTA**

---

| | |
|---|---|
| DUNG T. VO, | Civil No. 03-5755 (JRT/FLN) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| RESISTANCE TECHNOLOGY, INC., | |
| Defendant. | |

---

Lisa C. Stratton and Leslie L. Lienemann, **CULBERTH, LIENEMANN & STRATTON, LLP**, 1050 Piper Jaffray Plaza, 444 Cedar Street, St. Paul, MN 55101, for plaintiff.

John J. McDonald, Jr. and Susan K. Fitzke, **MEAGHER & GEER, P.L.L.P.**, 33 South Sixth Street, Suite 4200, Minneapolis, MN 55402, for defendant.

Plaintiff Dung Vo is a Vietnamese immigrant who has been in the United States since 1992. She began working for defendant Resistance Technology, Inc. ("RTI") in 1994 as a second-shift grade two printing operator. Since then, she has been promoted several times and, since 1996, has been a grade five multi-operational employee. Plaintiff asserts that, over the years, she has had difficulties with a number of RTI employees who harassed her because of her race/ethnicity. Plaintiff also asserts that RTI was aware of the harassment, and the reason for it, but failed to take adequate measures to curb it. Plaintiff's lawsuit against RTI alleges that RTI discriminatorily failed to promote her, that she was retaliated against for complaining about the harassment, and that the harassment resulted in a hostile work environment. Defendant asserts that

plaintiff cannot establish a prima facie case for any of her claims and moves for summary judgment. For the following reasons, the Court grants in part and denies in part defendant's motion for summary judgment.

## BACKGROUND

According to plaintiff, between 1994 and 1997, her co-workers, particularly Bernice Bursch, Linda Kofler, Linda Schneider, Laurie Schmidt, Julie Schmidt, and Marie Kremer, routinely harassed her by hiding tools and materials,[1] requiring her to do work that first shift operators were not required to do, falsely accusing her of mistakes and problems, leaving their failed parts for her to fix before she began her own work, and improperly critiquing and monitoring plaintiff's work. Plaintiff complained that she was being treated unfairly, first to her supervisors, Gregg Vogel and Deb Benton, and then to their supervisor Mark Steiner and others, but nothing was done in response to her complaints.

On her May 1997 performance review, plaintiff received 9 out of 12 possible points for attitude and initiative because of her difficulties with the other employees. Plaintiff disagreed with the assessment. Plaintiff received all other available points, for a total score of 97 out of 100, entitling her to the maximum pay raise.

In April 1999, four Exacto blades, which are used at RTI, were placed in plaintiff's car tire while it was parked in the RTI parking lot, causing a flat tire. Plaintiff

---

[1] For example, plaintiff alleges that the other women would hide the newer, better gold ink necessary for plaintiff's printing jobs in a locked drawer, preventing her from producing the same high-quality work that the others were producing.

reported the incident to her supervisors, including her direct supervisor Tracy Ellingson and Plant Manager Bob Aarthun, and to Sally Wahlberg in the Human Resources Department. The incident scared plaintiff, and she requested that RTI install surveillance cameras in the parking lot. Plaintiff mentioned that she had recently had problems with RTI employees Linda Kofler, Laurie Schmidt, Bernise Bursch, and, most recently, John Steele. RTI installed additional lighting and arranged for a second-shift supervisor to visit the parking lot periodically, but decided not to install cameras due, in part, to their cost. It was never established who was responsible for the vandalism of plaintiff's tires.

Afraid for her safety, plaintiff requested, and was granted, a transfer to RTI's Vadnais Heights facility. However, there was not enough work in Vadnais Heights to keep plaintiff busy. Still afraid, plaintiff tendered her resignation rather than return to the Arden Hills facility. RTI offered plaintiff a raise and promised that she would only work under Ellingson, who she trusted, and plaintiff agreed to return to work.

Upon returning to Arden Hills in August 1999, plaintiff was assigned to work second shift on the wirebond machine. Bernice Bursch worked first shift on the same machine. The two women began having problems immediately. According to plaintiff, Bursch refused to greet her on her first day and, on plaintiff's second day, attempted to prevent plaintiff from running the machine. Thereafter, plaintiff asserts, Bursch and other first shift employees harassed her by hiding her possessions; moving or hiding her toolbox; changing the settings on the machine they both worked on; leaving trays on top of plaintiff's toolbox; leaving improper notes, messages, and Discrepancy Reports for plaintiff; working on easier orders while leaving the more difficult orders for plaintiff;

not following company rules and policies; making unfounded complaints about plaintiff's work; and leaving unfinished work for plaintiff to finish. Plaintiff also asserts that Bursch and Kremer once left a negative note for, and directed some negative comments in a log chart towards, another Asian employee who sometimes worked on the wirebond machine. These actions interfered with plaintiff's ability to do her work and upset her. Ellingson tried to investigate these problems and suggested to the company's Human Resources Department that a camera be installed to find out who was responsible, but no action was taken.

In March 2000, seven months after plaintiff returned to Arden Hills, Bursch complained to Connie Buchner, the Human Resources Administrator, and members of management that Ellingson and first shift supervisor Mike Tate favored plaintiff; supervisor Gregg Vogel did not react appropriately when Bursch brought errors to his attention; other employees including the plaintiff were not following RTI rules and procedures; the plaintiff had wrongly accused her of improper actions; and plaintiff left her tools out and failed to clean up after her shift. Buchner, Tate's supervisor Kevin Kutina, and other members of the RTI Human Resources Department and management met between themselves and with Bursch to try to arrive at a solution. Bursch refused to meet with plaintiff. It was agreed that Ellingson should talk to plaintiff about "any issues with her that need to be addressed." (Hemmelman Ex. 8.)

During the spring of 2000, plaintiff requested a meeting with her supervisors to discuss her difficulties with Bursch. On May 24, plaintiff met with Ellingson, Tate, and Kutina. On the same day, plaintiff met with RTI Human Resources Manager Cari Sather

to discuss her complaints about Bursch and her dissatisfaction with the response she had received during the meeting with Ellingson, Tate, and Kutina.  Sather and plaintiff agreed to set up a meeting with plaintiff, Bursch, Sather, and other members of management and Human Resources.  Several days later, plaintiff complained again to Sather that Bursch was not following RTI rules that plaintiff was required to follow; that Tate had improperly voided two Discrepancy Reports that plaintiff had written concerning Bursch's work; that her timecard had disappeared over the weekend; that other personal paperwork had been found in the wirebond cabinet; and that another employee, Eugenio Ramirez, had improperly requested that she write an informal note rather than a Discrepancy Report about his work.  Additionally, plaintiff complained that stacks of trays were being left on her toolbox with increasing frequency.  Ellingson held a meeting with plaintiff and Bursch, but it was unproductive.

At some point in May, another RTI employee told Ellingson that Bursch and Kremer had stated that Ellingson and management favored the plaintiff because she was Asian, which they considered reverse discrimination, and that they may want to get even with Ellingson or plaintiff.  Ellingson noted this comment in a memo to Kutina, and sent copies to Human Resources and Tate.

After a number of cancellations, a meeting was eventually held on June 20, 2000.  Bursch met first with management and Human Resources.  Bursch again voiced numerous complaints about plaintiff's behavior.  In response to a question, Bursch said, "What would she (Dung) say 'Me no understand?'" (Hemmelman Exs. 14, 15; Kutina Dep. pp. 88-92.)  Both Kutina and Buchner noted the comment.  Buchner's notes state, "I

am concerned about Bernice's language, as far as making a remark that would be racially motivated." (Hemmelman Ex. 15.) According to defendant, Buchner verbally reprimanded Bursch over the comment. Later that day, plaintiff, Bursch, Sather, Buchner, Ellingson, Tate, and Kutina met. Plaintiff and Bursch each accused the other of harassment and of not following RTI rules and procedures. Both raised their voices, with plaintiff stating that she "could not work with a crazy person like this" and Bursch saying that plaintiff "had no brain in [her] head" and swearing at plaintiff. (Ellingson Dep. pp. 256-60; Vo Dep. p. 163.) Plaintiff was told not to write extraneous notes on company forms. Plaintiff contends that Bursch frequently wrote similar notes but was not reprimanded for it. At the end of the meeting, an action plan was developed. On June 27, 2000, plaintiff complained to Buchner that Bursch was not abiding by the plan agreed to at the June 20 meeting. Buchner told plaintiff to just do her part, and that Buchner would relay plaintiff's concerns to Kutina.

In October, Julie and Laurie Schmidt accused plaintiff of sleeping on the job. Ellingson confronted plaintiff, who explained that she had eye irritation and had been resting her eyes. The matter was not pursued.

In January 2001, RTI terminated plaintiff's boyfriend, Jon Blackstone, ostensibly for not returning to work early from a vacation in Vietnam with plaintiff. RTI knew of the relationship. According to Blackstone, his supervisor told him several months later that Plant Manager Bob Aarthun had pressured him to terminate Blackstone possibly because of the relationship.

Sometime in mid-2001, after a dispute with plaintiff, Eugenio Ramirez told Ellingson that if plaintiff were in his country, she would be dead. Ellingson reported the comment to his supervisors and to Human Resources. Ramirez was eventually terminated for sleeping at work.

On July 6, 2001, the window of plaintiff's car was broken while parked in the RTI parking lot. Plaintiff reported the incident to Sather, and again asked that cameras be installed in the parking lot. Plaintiff reported that she suspected Eugenio Ramirez, and also reported that Laurie Smith and Bursch continued to harass her. Sather discussed the incident with Ellingson, the head of facility maintenance, Terry Blees, and Aarthun. Blees recommended against installing cameras, and suggested installing additional lighting.

On her November 2001 performance review, plaintiff received 6 out of 12 possible points on the attendance section of the review. Plaintiff objected that she had previously been allowed to combine personal and vacation time, which would have resulted in a score of 12. The supervisor that completed the review explained that combining time was against company policy and that allowing such special treatment would be unfair. The supervisor also commented that plaintiff should "work on being more of a positive influence in the cell." (Hemmelman Ex. 24.) Plaintiff received a total score of 83 out of a possible 100. The additional six points would not have entitled plaintiff to a larger raise than the one she received.

On May 31, 2002, plaintiff's tire was punctured in the parking lot. She reported the incident to Sather, and also mentioned that she had recently noticed several scratches

and dents on her car. Plaintiff told Sather that she suspected Laurie and Julie Schmidt of causing the damage and again requested that cameras be installed. Sather discussed the incident with Ellingson and another second shift supervisor, John Brock, who agreed to ask whether any second shift employees had seen anything. Brock posted a sign asking any employee with information regarding the vandalism to come forward in confidence, but received no responses. Sather also discussed the possibility of installing cameras with Aarthun and with the facilities manager, who reiterated his opinion that cameras were not necessary. Ultimately, although the company had recently installed cameras in Vadnais Heights in order to prevent theft, Aarthun decided that cameras were too expensive in this case. Thereafter, RTI permitted plaintiff to park in the visitor parking spaces in front of the building so that her car would be more visible and permitted Ellingson to escort plaintiff to and from the building. It was never determined who was responsible for the vandalism.

That same month, plaintiff applied and interviewed for a promotion to a second shift Technician 2 position that was posted internally.[2] During the interview, which was shortly after the last vandalism incident, plaintiff learned that the position was actually for a second shift Lead. Plaintiff withdrew her application because she was afraid to be in a leadership position. According to plaintiff, the interviewer responded callously to her concerns, and failed to seriously consider plaintiff's application or discuss any concerns about her qualifications with her. Plaintiff asserts that a less experienced white

---

[2] Two positions were available – one for second shift and one for third shift. Plaintiff did not apply for the third shift position.

production worker was promoted into the position. According to Sather, however, RTI expanded the duties of an existing second-shift supervisor rather than fill the second shift position.[3] (Sather Dep. at 216.) Plaintiff complained to Human Resources about what she perceived to be a discriminatory selection.

On June 27 or 28, 2002, the car of a white temporary worker was vandalized. The phrase "overpaid dyke" was written on her car in permanent marker, and another note was left stating "I hope you have health insurance." Following an investigation, RTI determined that the vandalism had been committed by a RTI employee. Aarthun held mandatory plant-wide meetings on July 2 and 3 to remind employees of RTI's zero tolerance policy with respect to vandalism.

During the summer, plaintiff complained several times to a supervisor, Deb Benton, about two notes that plaintiff considered harassing and offensive – one left by Bursch regarding a broken chair that plaintiff was using and one written by Kremer and taped to plaintiff's toolbox. In response, Benton and Sather advised Bursch that she should not write any more notes and Tate advised Kremer not to write any more notes.

On September 24, 2002, plaintiff filed a charge of discrimination with the Minnesota Department of Human Rights alleging discrimination on the basis of race or national origin. Although defendant investigated plaintiff's administrative charge, plaintiff alleges that RTI did not investigate fully or impartially. Specifically, plaintiff asserts that defendant did not speak with Ellingson and other supervisors, did not

---

[3] RTI temporarily filled the third shift position with a temporary worker from a placement agency. (Sather Dep. at 212.)

interview plaintiff's co-workers or other Asian employees, and sought out information about plaintiff's conflicts with employees.

In her November 2002 performance review, plaintiff received 9 of 12 possible points in the attitude and initiative category, and a total score of 92 out of 100 points. If plaintiff had been eligible for a raise, this score would have entitled plaintiff to the maximum available raise.

In late 2003, plaintiff again applied for a second shift Lead position. At approximately that time, the third shift was eliminated entirely, and RTI transferred a third shift Lead to the second shift.

Subsequently, plaintiff filed the current action, alleging hostile work environment and failure to promote based on race and national origin in violation of Title VII, 42 U.S.C. § 1981, and the Minnesota Human Rights Act ("MHRA"). Additionally, plaintiff alleges reprisal in violation of the Minnesota Human Rights Act.[4]

## ANALYSIS

**I.      SUMMARY JUDGMENT STANDARD**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a

---

[4] Plaintiff has advised the Court that she is no longer pursuing the Title VII retaliation claim initially included in the complaint. Accordingly, the Court will grant defendant's motion for summary judgment with respect to this claim.

judgment as a matter of law." Only disputes over facts that might affect the outcome of the suit under the governing substantive law will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Summary judgment is not appropriate if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* Summary judgment is to be granted only where the evidence is such that no reasonable jury could return a verdict for the nonmoving party. *Id*.

The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The nonmoving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts in the record. *Vette Co. v. Aetna Casualty & Surety Co.,* 612 F.2d 1076, 1077 (8th Cir. 1980). However, the nonmoving party may not merely rest upon allegations or denials in its pleadings, but it must set forth specific facts by affidavits or otherwise showing that there is a genuine issue for trial. *Forrest v. Kraft Foods, Inc.*, 285 F.3d 688, 691 (8th Cir. 2002).

**II.    CLAIMS**

Claims of discrimination in violation of Title VII, Section 1981, and the MHRA are all analyzed under the familiar burden-shifting standard enunciated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *Griffith v. City of Des Moines*, 387 F.3d 733, 736-37 (8th Cir. 2004) (reaffirming that claims under Title VII are analyzed

under *McDonnell Douglas*); *Elmahdi v. Marriott Hotel Servs., Inc.*, 339 F.3d 645, 652 (8th Cir. 2003) ("Claims alleging a hostile work environment under § 1981 are analyzed using the same standards as Title VII claims."); *Clearwater v. Indep. Sch. Dist. No. 166*, 231 F.3d 1122, 1124 n.2 (8th Cir. 2000) (noting that race discrimination and hostile work environment claims under the MHRA are analyzed under the Title VII standard); *Hoover v. Norwest Private Mortg. Banking*, 632 N.W.2d 534, 548 (Minn. 2001) ("A reprisal claim [under the MHRA] is analyzed under the *McDonnell Douglas* burden-shifting test."). Under *McDonnell Douglas*, the plaintiff first is required to establish a prima facie case of discrimination. The burden of production then shifts to defendant to assert a legitimate reason for the allegedly discriminatory action. *McDonnell Douglas*, 411 U.S. at 802. If the defendant is able to do so, the burden shifts back to the plaintiff to establish that the asserted legitimate reason was merely a pretext for a discriminatory action. *Id.* at 804.

### A. Discriminatory Failure to Promote

In order to establish a prima facie case of discriminatory failure to promote, plaintiff must demonstrate that (1) she is a member of a protected group; (2) she was qualified and applied for a promotion to an available position; (3) she was rejected; and (4) a similarly situated employee, not part of the protected group, was promoted instead. *Younts v. Fremont County, Iowa*, 370 F.3d 748, 754 (8th Cir. 2004); *Turner v. Honeywell Fed. Mfg. & Techs., LLC*, 336 F.3d 716, 720 (8th Cir. 2003). Defendant concedes, for

purposes of this motion, that plaintiff can establish the first two elements. However, defendant disputes that plaintiff can establish either the third or fourth elements.

Plaintiff applied for two positions; the second shift Technician 2 position posted in May 2002 and the second shift Lead position posted in late 2003. Plaintiff withdrew her application for the first position. Additionally, rather than fill the position for which plaintiff applied, RTI expanded the duties of an existing supervisor. Plaintiff therefore cannot establish the third or fourth elements of her prima facie case with respect to the 2002 position.

The 2003 position similarly was not filled through a promotion, but by moving a person already performing that position during the third shift laterally. *Turner*, 336 F.3d at 722 (While a "plaintiff need not prove [her] relative qualifications to meet [her] prima facie burden," where the person selected to fill the position has objectively greater qualifications, such as a higher level of education or work experience in the field, than the plaintiff, the two are not similarly situated for purposes of establishing a prima facie case); *see also Fletcher v. St. Paul Pioneer Press*, 589 N.W.2d 96, 102 (Minn. 1999) (upholding determination that appropriate personnel action demoting a senior employee into the position to which plaintiff sought promotion is not discriminatory). The Court finds that this third shift employee, having already performed the job in question and, therefore, clearly having more experience in the field, is not similarly situated to plaintiff. Therefore, plaintiff cannot meet the fourth element of her prima facie case as to the 2003 position. Accordingly, the defendant's motion must be granted with respect to this claim.

### B. Reprisal

A prima facie case of reprisal under the MHRA requires a plaintiff to demonstrate that (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) a causal connection exists between her protected conduct and the adverse action. *Hoover*, 632 N.W.2d at 548; *see also LaCroix v. Sears, Roebuck, and Co.*, 240 F.3d 688 (8th Cir. 2001). For purposes of this motion, it is not disputed that plaintiff engaged in statutorily protected activity. *See* Minn. Stat. § 363A.15(1) (detailing statutorily protected activity, including opposing a prohibited practice, filing a charge, testifying, assisting, or participating in any manner in an investigation, proceeding or hearing under the chapter). Defendant disputes, however, that plaintiff suffered an adverse employment action.

Plaintiff alleges the following retaliatory actions (1) her toolbox was opened without her knowledge or permission, although nothing was taken; (2) the manner in which she received her paycheck stub was changed; and (3) she received a reduction in points for attitude in her November 2002 performance review. (Vo Dep. 272-73.) These actions would not constitute an adverse employment action for purposes of a Title VII retaliation claim. *Duncan v. Delta Consol. Indust., Inc.*, 371 F.3d 1020, 1026 (8th Cir. 2004) ("An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage. Termination, reduction in pay or benefits, and changes in employment that significantly affect an employee's future career prospects meet this standard, but minor changes in working conditions that merely inconvenience an employee or alter an employee's work responsibilities do not."

CASE 0:03-cv-05755-JRT-FLN Document 67 Filed 05/23/05 Page 15 of 20

(citations omitted)). Plaintiff argues, however, that the MHRA, which defines reprisal as including, but not limited to, "any form of intimidation, retaliation, or harassment," Minn. Stat. § 363A.15, is broader than Title VII. After reviewing Minnesota case law addressing reprisal claims, the Court finds that the language of the MHRA cannot be read so broadly as to provide relief for the allegedly retaliatory actions identified by the plaintiff.

In analyzing MHRA reprisal claims, Minnesota courts have routinely looked to federal case law discussing retaliation claims brought under Title VII. *See Fletcher*, 589 N.W.2d at 101; *Cierzan v. Hamline Univ.*, 2002 WL 31553931 (Minn. Ct. App. Nov. 19, 2002). For example, in *Peterson v. Minnesota*, the Minnesota Court of Appeals, in discussing the "very broad" statutory definition of reprisal, noted the federal standard for an adverse employment action and concluded that "[t]he definition of reprisal is broad enough to include transferring an employee to a position that she is unable to perform due to medical restrictions." 2001 WL 1530901, *3 (Minn. Ct. App. Dec. 4, 2001) (citation omitted). In another case, the appellate court upheld the trial court's verdict finding that a series of allegedly retaliatory acts by some of a police officer's coworkers, including refusing to socialize and communicate with her; approaching her while she was on duty and telling her that "Everybody's pissed off at you because of the complaint;" sending a letter to the Chief of Police making various allegations that resulted in an extensive investigation of plaintiff; improperly removing some of plaintiff's incident reports from the report bin; teasing her about having been placed on reduced status; and not providing requested back-up, constituted adverse employment actions sufficient to support a

- 15 -

reprisal claim. *Hopwood v. City of St. Paul*, 1999 WL 410293 (Minn. Ct. App. Jun. 22, 1999). In *Dewars v. City of Princeton*, the court upheld a reprisal claim, noting that "[w]hile the [reprisal] incidents examined individually might seem inconsequential, in the aggregate they illustrate a course of conduct creating a hostile environment" that "caused or directly contributed to the plaintiff's inability to function effectively as an active, dependable firefighter." 1995 WL 747884 (Minn. Ct. App. Dec. 19, 1995). In contrast, in *Gilbert v. IMI Cornelius, Inc.*, the court found that a plaintiff who claimed to have been treated differently and reprimanded at work, but was still employed by the defendant and had been promoted and received a raise could not establish that she suffered an adverse employment action. 1999 WL 343759, (Minn. Ct. App. Jun. 1, 1999).

Plaintiff was upset by the alleged retaliatory actions. However, there is no evidence that the alleged actions, separately or collectively, affected her ability to perform her job in the way that the reprisals in *Peterson*, *Hopwood*, and *Dewars* affected those plaintiffs. Rather, plaintiff, who remains employed by RTI and has regularly received raises, is more similar to the *Gilbert* plaintiff. Without attempting to define the contours of Minnesota reprisal law, which is a task best left to the Minnesota courts, the Court finds that the actions alleged by the plaintiff, even in the aggregate, do not constitute an adverse employment action under the MHRA. As plaintiff has not established the second element of her prima facie case, the Court will grant summary judgment to defendant on the reprisal claim.

### C. Hostile Work Environment

In order to proceed with her claim of hostile work environment discrimination, plaintiff must show that (1) she is a member of a protected class; (2) she was subject to unwelcome harassment; (3) a causal nexus exists between the harassment and her race and/or national origin; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take prompt, effective action. *Erenberg v. Methodist Hosp.*, 357 F.3d 787, 792 (8th Cir. 2004); *Tademe v. St. Cloud State Univ.*, 328 F.3d 982, 991 (8th Cir. 2003). It is not disputed that plaintiff is a member of a protected class or that she was subject to unwelcome harassment. However, defendant argues that plaintiff cannot demonstrate the remaining three elements of her claim.

Plaintiff details substantial harassing behavior from a number of RTI employees. At least two of the employees, Bursch and Kremer, were reported to have complained that Asians, including plaintiff, are favored at RTI and that such action constitutes reverse discrimination, and to have complained about other Asians at RTI. Furthermore, as Kutina and Buchner recognized, Bursch's comment concerning plaintiff's language skills easily could be interpreted as a racially motivated insult. The record also reflects that these comments were communicated to RTI management. Therefore, the Court finds that these comments are sufficient to establish the causal nexus between the ongoing harassment of plaintiff and plaintiff's race/national origin, and RTI's knowledge of the problem that is required for the purposes of the third and fifth elements at the summary judgment stage. *See Diaz v. Swift-Eckrich, Inc.*, 318 F.3d 796, 800 (8th Cir. 2003) ("All

instances of harassment need not be stamped with signs of overt discrimination to be relevant under Title VII if they are part of a course of conduct which is tied to evidence of discriminatory animus." Furthermore, the Court finds that for purposes of summary judgment, particularly when compared to the response accorded a single, albeit serious, incident of vandalism of a white employee's car, the series of meetings that RTI held regarding the plaintiff were neither a prompt nor an effective response to the multiple instances of harassment reported over a several year period of time.

To establish that the harassment altered a term, condition, or privilege or her employment, the plaintiff must demonstrate that the harassment was "severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). The court should examine all of the circumstances, including "the frequency of the conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance," and consider the cumulative effect of the acts. *Id.* at 22-23, *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115-16 (2002); *Diaz*, 318 F.3d at 800.

A reasonable person could find that the alleged harassment by plaintiff's co-workers was regular and sustained over a several year period of time, the three vandalism incidents that she suffered were both severe and physically threatening, and that the harassment, such as leaving unfinished projects for plaintiff, hiding tools and supplies, and failing to fill out required forms and records, interfered with plaintiff's ability to do

her job. Furthermore, plaintiff has testified that the harassment has caused her to suffer frequent and intense stomach aches, to lose sleep and weight, and to seek medical attention for anxiety and depression. Viewing the facts alleged in a light most favorable to the non-moving party for the purpose of analyzing a summary judgment motion, the Court finds that the constant nature of the harassment combined with the threatening nature of some of the actions and comments, along with management's inadequate response over an extended period of time, provides sufficient evidence for a reasonable person to find that the treatment plaintiff received created a hostile or abusive environment. Therefore, the Court denies defendant's motion for summary judgment on this claim.

This case will be placed on the Court's next available trial calendar.

**ORDER**

Based on the foregoing, all the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that defendant's motion for summary judgment [Docket No. 44] is **GRANTED IN PART and DENIED IN PART** as follows:

1. Defendant's motion is granted with respect to the failure to promote, reprisal, and retaliation claims; and

2. Defendant's motion is denied with respect to the hostile work environment claim**.**


DATED: May 23, 2005                         s/John R. Tunheim
at Minneapolis, Minnesota.               JOHN R. TUNHEIM
                                                      United States District Judge